Slip Op. 25-137

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **DOMTAR CORP.,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | **Before: Gary S. Katzmann, Judge** |
| **and** | **Court No. 24-00113** |
| **KOEHLER PAPER SE, MATRA AMERICAS LLC, and MATRA ATLANTIC GmbH,** | |
| **Defendant-Intervenors.** | |

### OPINION

[ Plaintiff's Motion for Judgment on the Agency Record is denied.]

Dated: <u>October 10, 2025</u>

<u>Daniel L. Schneiderman</u>, King & Spalding LLP, of Washington, D.C., argued for Plaintiff Domtar Corporation. With him on the brief was <u>Stephen J. Orava</u>.

<u>Emma E. Bond</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the brief were <u>Brett A. Shumate</u>, Assistant Attorney General, <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of counsel on the brief was <u>Ruslan Klafehn</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Thomas J. Trendl</u>, <u>Zhu (Judy) Wang</u>, and <u>Katherine Shin</u>, Steptoe LLP, of Washington, D.C., for Defendant-Intervenor Koehler Paper SE.

<u>R. Will Planert</u>, <u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>Brady W. Mills</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Jordan L. Fleischer</u>, <u>Edward J. Thomas III</u>, <u>Nicholas C. Duffey</u>, <u>Ryan R. Migeed</u>, and <u>Jenny (Shiyu) Liang</u>, Morris Manning & Martin LLP, of Washington, D.C., for Defendant-Intervenors Matra Americas, LLC and Matra Atlantic GmbH.

Katzmann, Judge:    This case arises from the U.S. Department of Commerce's ("Commerce") administrative review of the 2021 antidumping order on thermal paper[1] from Germany and Commerce's determination not to categorize accrued interest on unpaid antidumping duties as an indirect selling expense. See generally Thermal Paper From the Federal Republic of Germany: Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 47517 (Dep't Com. June 3, 2024), P.R. 140 ("Final Results"); Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Antidumping Duty Orders, 86 Fed. Reg. 66284 (Dep't Com. Nov. 22, 2021) ("2021 Order").  In the administrative review, Commerce counted the interest one respondent—German thermal paper producer Koehler Paper SE ("Koehler")—accrued from prior unpaid antidumping duties as a financial expense in calculating the cost of production.  See Final Results, 89 Fed. Reg. at 47518; Mem. From A. Cossaart to The File, re: Preliminary Results Margin Calculation for Koehler Paper SE and Koehler Kehl GmbH at 2 (Dep't Com. Nov. 21, 2023), P.R. 107, C.R. 187–88.  Domtar Corporation ("Domtar"), a U.S. producer of thermal paper, challenges the Final Results and asks the court to remand so that Commerce can categorize the accrued interest as an indirect selling expense instead.  See generally Compl., Aug. 1, 2024, ECF No. 9; Pl.'s Mot. for J. on the Agency R. and Supp. Br., Jan. 31, 2025, ECF No. 28 ("Pl.'s Br.").  Defendant the United States ("the Government") and Defendant-Intervenors Koehler, Matra

---

[1] "Thermal paper is paper coated with a mixture of dye and developer that react and form an image on the paper when heat is applied."  Petitions for the Imposition of Antidumping Duties at 1, Case No. A-428-850, Barcode: 4038032-02 (Oct. 7, 2020).  Thermal paper "is typically (but not exclusively) used in point-of-sale applications, such as ATM receipts, credit card receipts, gas pump receipts, labels, tickets, and tags."  Id.

Americas LLC ("Matra Americas"),[2] and Matra Atlantic GmbH ("Matra Atlantic")[3] ask the court

to sustain Commerce's <u>Final Results</u>.  <u>See generally</u> Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on

the Agency R., Apr. 1, 2025, ECF No. 30 ("Gov't Br."); Def.-Inters.' Resp. to Pl.'s Mot. for J. on

the Agency R., Apr. 1, 2025, ECF No. 31 ("Def.-Inters.' Br.").  The court concludes that

Commerce's determination that interest from unpaid antidumping duties is not an indirect selling

expense is supported by substantial evidence and in accordance with law.  Therefore, the court

denies Domtar's motion and sustains Commerce's <u>Final Results</u>.

## BACKGROUND

### I.    *Legal Background*

#### A.    *Antidumping Duties*

"Dumping occurs when a foreign company sells a product in the United States at a lower

price than it sells that same product for in its home market."  <u>Sioux Honey Ass'n v. Hartford Fire</u>

<u>Ins. Co.</u>, 672 F.3d 1041, 1046 (Fed. Cir. 2012).  This practice constitutes unfair competition

because it permits foreign producers to undercut domestic producers by selling products below

"fair value."  <u>See</u> <u>Apex Frozen Foods Private Ltd. v. United States</u>, 862 F.3d 1322, 1325–26 (Fed.

Cir. 2017).  Congress enacted the Tariff Act of 1930 (codified as amended at 19 U.S.C. §§ 1202 to

1683g) in part to empower Commerce to investigate potential dumping and, if necessary, to issue

orders imposing duties on subject merchandise.  <u>See</u> <u>id.</u> (citing 19 U.S.C. § 1673).  The U.S. Code

defines subject merchandise as "the class or kind of merchandise that is within the scope of an

---

[2] "Matra Americas is a United States importer of thermal paper products from Germany and is liable for paying antidumping duties pursuant to the antidumping duty amounts determined in the <u>Final Results</u>."  <u>See</u> Consent Mot. to Intervene at 1, Aug. 16, 2024, ECF No. 12.

[3] "Matra Atlantic is the exporter of the thermal paper that is subject of the <u>Final Results</u>."  Consent Mot. to Intervene at 1, Aug. 16, 2024, ECF No. 12.

investigation, a review, . . . [or] an order." 19 U.S.C. § 1677(25).[4]  If Commerce determines that

subject merchandise is being dumped in the United States and the International Trade Commission

separately determines that a domestic industry "is materially injured, or is threatened with

materially, or the establishment of an industry in the United States is materially retarded by reason

of imports of the subject merchandise," Commerce "shall . . . impose[] upon such merchandise an

antidumping duty."  19 U.S.C. § 1673.

       Commerce calculates antidumping duties to equal "the amount by which the normal value

exceeds the export price (or the constructed export price) for the merchandise."  Id.;  see also id.

§ 1677(35); Shandong Rongxin Import & Export Co. v. United States, 42 CIT __, __, 331 F. Supp.

3d 1390, 1394 (2018).  Commerce uses export price when an exporter sells subject merchandise

to an unaffiliated purchaser in the United States, whereas Commerce uses constructed export price

when subject merchandise is sold to an affiliated purchaser in the United States.

19 U.S.C. § 1677a(a)–(b); see also Micron Tech., Inc. v. United States, 243 F.3d 1301, 1303 (Fed.

Cir. 2001).  Commerce conducts annual reviews of antidumping duty orders upon the request of

any interested party.  19 U.S.C. § 1675(a)(1).  During such an administrative review, Commerce

must "review and determine [anew] . . . the amount of any antidumping duty." Id. § 1675(a)(1)(B);

see also id. § 1675(a)(2)(A).

       *B.    Calculating Normal Value*

       The normal value of subject merchandise is "the price at which the foreign like product is

first sold . . . in the exporting country . . . at the same level of trade as the export price or constructed

export price."  Id. § 1677b(a)(1)(B)(i).  Where Commerce finds that sales were made below the

---

[4] In full, Section 1677(25) defines "subject merchandise" as "the class or kind of merchandise that
is within the scope of an investigation, a review, a suspension agreement, an order under this
subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921."

Case 1:24-cv-00113-GSK    Document 44    Filed 10/10/25    Page 5 of 17

Court No. 24-00113                                                                 Page 5

cost of production, it may disregard those sales when calculating normal value. 19 U.S.C.
§ 1677b(b)(1). The cost of production is the sum of "the cost of materials . . . employed in
producing the foreign like product," the "selling, general, and administrative
expenses . . . pertaining to production and sales," and "the cost of containers[,] . . . coverings . . . ,
and all other expenses incidental to placing the foreign like product in condition . . . for shipment."
Id. § 1677b(b)(3). Commerce includes "financial expenses" in its calculation of general expenses.
Gulf States Tube Div. of Quanex Corp. v. United States, 21 CIT 1013, 1033, 981 F. Supp. 630, 648
(1997) (citation omitted); see also Am. Silicon Techs. v. United States, 334 F.3d 1033, 1037 (Fed.
Cir. 2003) (explaining calculation of financial expenses). "When normal value is based on sales
in the exporting country or a third country, the effect of a higher cost of production is a higher
normal value because more lower-priced sales will be disregarded. . . . It is therefore advantageous
to a foreign producer to demonstrate as low a cost of production as possible." Thai Pineapple
Canning Indus. Corp. v. United States, 273 F.3d 1077, 1080 (Fed. Cir. 2001).

### C.    *Calculating Constructed Export Price*

The U.S. Code and the Code of Federal Regulations together provide guidance on how
Commerce calculates constructed export price. The U.S. Code defines constructed export price as
"the price at which the subject merchandise is first sold . . . by a seller affiliated with the producer
or exporter, to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b).
Commerce shall reduce the constructed export price by "expenses generally incurred . . . in selling
the subject merchandise," id. § 1677a(d)(1), and by "expenses associated with commercial
activities . . . that relate to the sale to an unaffiliated purchaser, no matter where or when paid." 19
C.F.R. § 351.402(b). These expenses are called "indirect selling expenses." See Micron Tech.,
243 F.3d at 1306.

## II.    *Factual Background*

Central to Domtar's challenge to the administrative review of the 2021 Order is the interest accrued from unpaid antidumping duties Koehler owed on a 2008 antidumping duty order.  See Antidumping Duty Orders: Lightweight Thermal Paper From Germany and the People's Republic of China, 73 Fed. Reg. 70959 (Dep't Com. Nov. 24, 2008) ("2008 Order").  After several administrative reviews and subsequent litigation, Koehler owes about $200 million in antidumping duties stemming from the 2008 Order.  See Letter from King & Spalding to G. Raimondo, Sec'y of Com., re: Petitioners' Comments On The Initial Questionnaire Responses And Submission Of Rebuttal Factual Information at Attachment 1, p. 3 (Apr. 14, 2023), P.R. 52, C.R. 81 ("Petitioner Comments").  Koehler has not yet paid the $200 million, and interest has continued to accrue on the unpaid liabilities, including during the 2021–2022 period of review at issue here.  Id. at 5–6. The Government is separately involved in a collections proceeding against Koehler for the unpaid duties.  See United States v. Koehler Oberkirch GmbH, No. 24-00014 (Ct. Int'l Trade filed Jan. 24, 2024); see also United States v.  Koehler Oberkirch GmbH, 48 CIT __, __, 728 F. Supp. 3d 1322, 1325–27 (2024); United States v. Koehler Oberkirch GmBH, 49 CIT __, __, 776 F. Supp. 3d 1226, 1229 (2025).  The relevant issue here relates to how Commerce accounted for the interest on Koehler's unpaid antidumping duties in their calculation of the dumping margin in the 2021–2022 administrative review of the 2021 Order.

On November 22, 2021, Commerce issued an antidumping duty order on thermal paper. See 2021 Order.  In the order, Commerce accounted for the interest expenses—even though Koehler did not recognize or record the interest—by including it in Koehler's cost of production calculation.  See Mem. from J. Maeder to C. Marsh, re: Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value at 19, Case No. A-428-850, Barcode: 4164202-02 (Dep't Com. Sept. 24, 2021) ("2021 IDM").  Commerce initiated an

administrative review on January 3, 2023, covering a period of review from May 12, 2021 to

October 31, 2022.   See Initiation of Antidumping and Countervailing Duty Administrative

Reviews, 88 Fed. Reg. 50, 52 (Dep't Com. Jan. 3, 2023), P.R. 10 ("Initiation"); see also Mem.

from J. Maeder to A. Elouaradia, re: Decision Memorandum for the Preliminary Results of the

2021-2022 Administrative Review of the Antidumping Duty Order on Thermal Paper from the

Republic of Germany at 1 (Dep't Com. Nov. 21, 2023), P.R. 104 ("Prelim. IDM").

   During the administrative review, Commerce issued questionnaires to Koehler and Matra

Atlantic about sales and cost data.   See Letter from G. Raimondo, Sec'y of Com. to T. Trendl,

Steptoe & Johnson, LLP, re: 2021-2022 Administrative Review of the Antidumping Duty Order

on Thermal Paper from the Republic of Germany: Request for Information (Feb. 8, 2023), P.R. 24;

Letter from E. Eastwood, Director, AD/CVD Operations to R.W. Planert, Morris, Manning &

Martin, LLP, re: 2021-2022 Administrative Review of the Antidumping Duty Order on Thermal

Paper from the Republic of Germany: Request for Information (Feb. 24, 2023), P.R. 28.   Koehler

responded with information about "net interest expenses," but did not include accrued interest

owed on unpaid antidumping duties related to the prior 2008 Order.   See Letter from T. Trendl,

Steptoe & Johnson, LLP to G. Raimondo, Sec'y of Com., re: Koehler's Sections B and D

Questionnaire Response at Exhibit D-20 (Apr. 3, 2023), P.R. 50, C.R. 78, 80; Petitioner Comments

at 10–12.

   Domtar commented on Commerce's categorization of Koehler's interest expenses in the

calculation of the cost of production, arguing that Commerce should categorize the accrued interest

as an indirect selling expense to be removed from the constructed export price instead.   See

Petitioner Comments at 10–12.   In response to Commerce's request for additional information, see

Letter from G. Raimondo, Sec'y of Com., to T. Trendl, Steptoe & Johnson, LLP, re: Administrative

Review of the Antidumping Duty Order on Thermal Paper from Germany at 10–11 (July 25, 2023), P.R. 63, C.R. 87, Koehler provided Commerce a schedule with the additional interest expenses, see Letter from T. Trendl, Steptoe & Johnson, LLP to G. Raimondo, Sec'y of Com., re: Thermal Paper from the Germany: Koehler's Response to Section D of the Supplemental Questionnaire at 26–28 (Aug. 10, 2023). P.R. 69, 70, C.R. 115, 126.  Koehler noted that it did not track its accrued interest expenses in its financial accounts but used a daily interest rate to calculate the interest it owes.  Id. at 27–28.

Commerce issued preliminary results for the administrative review on November 29, 2023. Thermal Paper From the Republic of Germany: Preliminary Results of Antidumping Duty Administrative Review; 2021–2022, 88 Fed. Reg. 83397, (Dep't Com. Nov. 29, 2023), P.R. 114. Commerce continued to include the accrued interest as part of the cost of production used to calculate normal value.  Prelim. IDM at 12.  Domtar submitted a case brief arguing again that the interest should instead be included as an indirect selling expense deducted from the constructed export price.  Letter from D.L. Schneiderman, King & Spalding, to G. Raimondo, Sec'y of Com., re: Thermal Peper from Germany: Petitioners' Case Brief at 6–9 (Apr. 26, 2024), P.R. 126, C.R. 263.  Koehler also filed a case brief arguing that "[e]xpenses related to antidumping duties are not directly related to sales of subject merchandise to be considered a[n] [indirect] selling expense, as required under 19 U.S.C. § 1677a(d)(1)(D)."  Letter from T. Trendl & D.B. Cameron to G. Raimondo, Sec'y of Com., re: Joint Rebuttal Brief of Koehler Paper SE, Matra Americas, LLC, and Matra Atlantic GmbH at 1–2 (May 1, 2024), P.R. 128, C.R. 264.

On June 3, 2024, Commerce published its Final Results, continuing to include the interest as part of the cost of production rather than as an indirect selling expense.  Final Results; see also Mem. from J. Maeder to R. Majerus, re: Decision Memorandum for the Final Results of the

Antidumping Duty Administrative Review of Thermal Paper from the Republic of Germany;

2021-2022 at 1, 7 (May 24, 2024), P.R. 135 ("IDM").  Commerce disagreed with Domtar that the

interest related to Koehler's sales in the U.S. and stated instead that the interest is related to unpaid

antidumping duties on the revoked <u>2008 Order</u>.  IDM at 6–7.

### III.    *Procedural History*

On August 1, 2024, Domtar filed a complaint in the U.S. Court of International Trade

("USCIT") contesting the <u>Final Results</u> of Commerce's 2021–2022 administrative review of the

<u>2021 Order</u>.  Compl. at 2.  On January 31, 2025, Domtar filed a Motion for Judgment on the

Agency Record.  Pl.'s Br.  On April 1, 2025, the Government and Defendant-Intervenors Koehler,

Matra Americas, and Matra Atlantic filed respective responses.  Gov't Br.; Def.-Inters.' Br.  Domtar

subsequently filed its reply on May 1, 2025.  Pl.'s Reply Br. in Supp. of Mot. for J. on Agency R,

May 1, 2025, ECF No. 32 ("Pl.'s Reply").

Prior to oral argument, the court sent a letter to parties containing questions for oral

argument.  Letter re: Qs. for Oral Arg., June 25, 2025, ECF No. 37.  On July 3, 2025, both Domtar

and the Government filed answers to those oral argument questions.  Pl.'s Resp. to Ct.'s Qs., July

3, 2025, ECF No. 38 ("Pl.'s OAQ Resp."); Def.'s Resp. to Ct.'s Qs, July 3, 2025, ECF No. 39

("Gov't OAQ Resp.").  The court held oral argument as scheduled on July 9, 2025.  <u>See</u> Order,

May 29, 2025, ECF No. 36.  Following oral argument, Domtar and the Government filed

supplemental post argument briefs.  Def.'s Post-Arg. Submission, July 21, 2025, ECF No. 41; Pl.'s

Post-Arg. Submission, July 21, 2025, ECF No. 42.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(ii).  The standard of review in this action is set forth in 19

U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

Commerce "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)) (referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Vietnam) Ltd. v. United States, 33 CIT 1407, 1416, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of Commerce with respect to the substantial evidence standard). A determination by Commerce "is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence may support Commerce's determination even if there is "evidence that detracts from the agency's conclusion or [if] there is a 'possibility of drawing two inconsistent conclusions from the evidence.' " Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1373 (2012) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

## DISCUSSION

Domtar argues that Commerce's decision not to categorize interest as an indirect selling expense is not supported by substantial evidence and not in accordance with law. See Pl.'s Br. at 10. Recall that an expense must meet the statutory and regulatory standards set out under 19 U.S.C. § 1677a(d)(1) and 19 C.F.R. § 351.402(b) for Commerce to consider it an indirect selling expense that is deducted from the constructed export price. Under 19 U.S.C. § 1677a(d)(1),

indirect selling expenses are "generally incurred . . . in selling the subject merchandise."[5]  See also

Micron Tech., 243 F.3d at 1306.  19 C.F.R. § 351.402(b) further provides that indirect selling

expenses are "associated with commercial activities in the United States that relate to the sale to

an unaffiliated purchaser, no matter where or when paid."[6]  See also Micron Tech., 243 F.3d at

1304 ("noting that Commerce "formalized the methodology" for deducting indirect selling

expenses in 19 C.F.R. § 351.402(b)).  The relevant question in this case is whether interest accrued

on unpaid duties related to the prior 2008 Order are "generally incurred . . . in selling the subject

merchandise" of the 2021–2022 administrative review of the 2021 Order.  19 U.S.C. § 1677a(d)(1).

According to Domtar, Koehler's unpaid "antidumping duties were 'associated with

commercial activities in the United States,' and they necessarily 'relate[d] to the sale to an

unaffiliated purchaser.' "  Pl.'s Br. at 9 (quoting 19 C.F.R. § 351.402(b)).  Accordingly, Domtar

argues, "[a]ny interest accruing during the instant review period on such underlying liabilities

should similarly have been deemed to relate to the same U.S. economic activities."  Id.  The

Government counters that "Koehler's accrued interest on unpaid antidumping duties was not

---

[5] 19 U.S.C. § 1677a(d)(1) in full reads:

> For purposes of this section, the price used to establish constructed export price shall also be reduced by—the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added) . . . .

[6] 19 C.F.R. § 351.402(b) in full reads:

> In establishing constructed export price under section 772(d) of the Act, the Secretary will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid. The Secretary will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States, although the Secretary may make an adjustment to normal value for such expenses under section 773(a)(6)(C)(iii) of the Act.

incurred on merchandise within the scope of this review of the current 2021 Order," and is instead "related to unpaid antidumping duties on the [2008 Order], an order which was subsequently revoked." Gov't Br. 14. Domtar responds that the 2008 and 2021 Orders covered the same merchandise and that there is no disconnect between the interest accruing during the period of review and Koehler's sales during that same period. Pl.'s Br. at 10. The court finds that interest accrued on unpaid duties on thermal paper sold under the 2008 Order was neither "generally incurred . . . in selling the subject merchandise" nor "associated with commercial activities in the United States that relate to the sale [of subject merchandise] to an unaffiliated purchaser." 19 U.S.C. § 1677a(d)(1), 19 C.F.R. § 351.402(b). Because the accrued interest does not meet the statutory and regulatory standards set out in 19 U.S.C. § 1677a(d)(1) and 19 C.F.R. § 351.402(b), Commerce's determination not to categorize the interest as an indirect selling expense is supported by substantial evidence and in accordance with law.[7]

Under § 1677b, "[i]n determining . . . whether subject merchandise is being, or is likely to be sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). The U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") has described this fair comparison as an " 'apples-to-apples' comparison between foreign market value and United States price." Micron Tech., 243 F.3d at 1304 (quoting Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995)). In comparing export price or constructed export price and normal value, Commerce looks

---

[7] Domtar's argument regarding Commerce's treatment of the interest expenses does not focus on Commerce's determination to treat the interest expenses as a component of cost of production. Instead, Domtar argues only that "[t]he interest expense at issue should have been deducted from [constructed export price] as an indirect selling expense." Pl.'s Br. at 7. Thus, we do not independently consider Commerce's determination to treat the interest as a component of Koehler's cost of production and we sustain the Final Results only in respect to Commerce's determination not to treat the interest as an indirect selling expense.

at "the price at which comparable goods were sold in the exporter's home market"—the normal

value—"during the period of review."  Hyundai Steel Co. v. United States, 19 F.4th 1346, 1349

(Fed. Cir. 2021).  To make a fair "apples-to-apples" comparison, Commerce should likewise look

at the price of the exported goods in the United States—the export price or constructed export

price—during the period of review.  Micron Tech., 243 F.3d at 1304.  Thus, when considering

whether an expense is "generally incurred . . . in selling the subject merchandise," the term

"subject merchandise" refers only to merchandise sold during the period of review.  19 U.S.C.

§ 1677a(d)(1).  The USCIT's holding in Allegheny Ludlum Corp. v. United States supports this

conclusion.  There, the court stated that 19 U.S.C. § 1677(25) "explicitly defines 'subject

merchandise' as that which shares common physical characteristics and falls within the temporal

scope of a review."  26 CIT 1124, 1129, 240 F. Supp. 2d 1262, 1267 (2002) (emphasis in original),

aff'd, 346 F.3d 1368 (Fed. Cir. 2003); see also Chia Far Indus. Factory Co. v. United States, 28 CIT

1337, 1369, 343 F. Supp. 2d 1344, 1374 (2004) ("Merchandise that entered the U.S. prior to the

period of review is not 'subject merchandise' within the meaning of 19 U.S.C. § 1677(25).").[8]

Here, the subject merchandise is thermal paper sold between May 12, 2021 and October

31, 2022, see Initiation, 88 Fed. Reg. at 52, and a fair "apples-to-apples" comparison is between

thermal paper sold in the United States and thermal paper sold in Germany during that period of

review.  Thermal paper sold in 2008 was subject to different market conditions than merchandise

---

[8] Grammar and syntax also shed light on the meaning of the term "subject merchandise."  "[T]he 'rules of grammar govern' statutory interpretation" and should be used to give meaning to different parts of a statute.  Nielsen v. Preap, 586 U.S. 392, 408 (2019) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012)).  Here, the use of a singular "a" and "an" before the words "investigation, review, or order" suggests that "subject merchandise" is limited to the products within the scope of a specific, individual review or order.  Thus, subject merchandise in the 2023 administrative review of the 2021 Order includes the products within the scope of that individual review, not within the scope of the 2008 Order.

sold in 2021 and may have been priced differently. Including subject merchandise that was sold outside the period of review when calculating normal value would not result in the fair comparison that Commerce is tasked with making and would result in an antidumping margin that is not reflective of the period of review. Products sold under the 2008 Order are not subject merchandise under the 2021–2022 administrative review of the 2021 Order, and interest incurred on unpaid antidumping duties from selling those products is not a selling expense "incurred . . . in selling the subject merchandise" under 19 U.S.C. § 1677a(d)(1)(D). Therefore, the interest at issue cannot properly be considered an indirect selling expense for the purpose of the 2021–2022 administrative review of the 2021 Order.

Domtar also suggests that "Commerce's established practice . . . is to treat interest expenses incurred in selling the subject merchandise as [indirect selling expenses] rather than as," part of the cost of production. Pl.'s Br. at 8. Domtar argues that NTN Bearing Corp. v. United States, 27 CIT 129, 143, 248 F. Supp. 2d 1256, 1269 (2003), a case where the USCIT sustained Commerce's rejection of a request to remove interest expenses from indirect selling expenses, demonstrates that "interest expenses incurred by a respondent to finance its antidumping cash deposits should be treated as 'indirect selling expenses' and deducted from [constructed export price] pursuant to 19 U.S.C. § 1677a(d)(1)." Pl.'s Post-Arg. Submission at 2 (emphasis in original). However, Domtar's argument mischaracterizes NTN Bearing. In that case, the USCIT noted Commerce's policy to not treat antidumping duties and cash deposits of antidumping duties as indirect selling expenses to be deducted from export price because "[t]o do so would involve a circular logic that could result in an unending spiral of deductions for an amount that is intended to represent the actual offset for the dumping." Id. at 138, 1264 (quoting Tapered Roller Bearings and Parts Thereof, Finished and Unfinished From Japan, and Tapered Roller Bearings, Four Inches or Less

in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Reviews, 63 Fed. Reg. 63860, 63865 (Dep't Com. 1998) ("Final NTN Results"). Based on this policy, Commerce refused to remove interest incurred in financing cash deposits from indirect selling expenses—as it would for antidumping duties and cash deposits of antidumping duties—because they "are not a direct, inevitable consequence of an antidumping duty order." Id. at 138, 1265 (quoting Final NTN Results at 63865).

In NTN Bearing, the USCIT largely restated Commerce's reasoning that "[f]inancial expenses allegedly associated with cash deposits are not  direct, inevitable consequence of an antidumping order," to ultimately hold that it was reasonable not to deduct them from indirect selling expenses; it did not closely or independently scrutinize whether the interest expenses met the statutory and regulatory standards for indirect selling expenses in the first place. Id. at 143, 1269.  Unlike in NTN Bearing, Commerce did not here consider whether the interest expenses at issue are "inevitable" consequences of the antidumping duty order such that they should be removed from the indirect selling expenses; instead Commerce did not categorize the interest expenses as indirect selling expenses in the first place because Commerce concluded that the interest expenses "do not relate directly to sales of subject merchandise."  See generally IDM at 5–7.  The question before us is whether Commerce's determination that the interest expenses were not "generally incurred . . . in selling the subject merchandise," such that they are not an indirect selling expense under 19 U.S.C. § 1677a(d)(1) is supported by substantial evidence—an issue the court did not closely consider in NTN Bearing.[9]

---

[9] Domtar also cites to Commerce's determination in an administrative review of duties on Turkish aluminum foil to argue that Commerce has an established practice of treating interest expenses as indirect selling expenses. See Pl.'s Br. at 8 (citing Certain Aluminum Foil From the Republic of Turkiye: Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 48889 (Dep't Com. June 10, 2024).  Unlike the interest expenses at issue here, the interest expenses in Aluminum Foil from Turkey were incurred by a company "that sold subject merchandise to

Domtar also argues that "Commerce did not explain why this purported distinction [between liabilities arising on imports subject to the <u>2008 Order</u> rather than the <u>2021 Order</u>] was dispositive under the applicable statute and regulation." While it is true that Commerce "must . . . articulate a satisfactory explanation for its action," <u>State Farm</u>, 463 U.S. at 43, Domtar later conceded that "[i]n the <u>Final Results</u>, Commerce . . . did provide an explanation." Pl.'s Br. at 7 (citing IDM at 6–7). Commerce explained that because the interest was related to a revoked order from 2008, it did not "relate to the sale to an unaffiliated purchaser" as required under 19 C.F.R. § 351.402(b). IDM at 7 (internal quotation marks omitted). Commerce's explanation addressed both the statutory and regulatory standards that need to be met for an expense to be an indirect selling expense in concluding that the interest expenses "are related to unpaid antidumping duties on the Order, an order which was subsequently revoked [and] [t]hus[] . . . do not relate directly to sales of subject merchandise to an unaffiliated purchaser under the current order on thermal paper from Germany." IDM at 7.

Finally, Domtar suggests that "Koehler should not be permitted to maintain virtually duty-free access to the U.S. thermal paper market, as would be enabled by the insignificant margin calculated in the <u>Final Results</u>, without paying final assessments on past thermal paper entries." Pl.'s Br. at 10. According to Domtar, categorizing the interest as an indirect selling expense would

---

unaffiliated U.S. customers." Mem. from J. Maeder to R. Majerus, re: Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review of the Antidumping Duty Order on Certain Aluminum Foil from the Republic of Turkiye; 2021-2022 at 16, Case No. A-489-844, Barcode: 4571433-02 (Dep't Com. June 4, 2024). Therefore, Commerce concluded, the interest was "incurred . . . in connection with economic activities occurring in the United States," and qualified as an indirect selling expense. <u>Id.</u> This is unlike the present case, where the interest was incurred in connection with unpaid antidumping duties related to a past antidumping duty order, not in connection with the sale of subject merchandise during the 2021–2022 period of review. Regardless, the practice of "administrative authorities cannot alter clear and explicit statutory provisions." <u>Louisville & N. R. Co. v. United States</u>, 282 U.S. 740 (1931).

generate a higher dumping margin on Koehler's current exports and thus would "create an incentive for Koehler to . . . ultimately resolve its outstanding debt." Pl.'s Br. at 11. It is not within the province of the court to consider the policy implications of this ruling on Koehler's actions. While it may be that incentivizing parties to timely pay antidumping duties is a respectable goal, such a policy objective cannot overcome statutory text and precedent.

## CONCLUSION

For the reasons stated above, Commerce reasonably concluded in the 2021–2022 administrative review of the 2021 Order that interest accrued on unpaid antidumping duties related to the 2008 Order is not "generally incurred . . . in selling the subject merchandise" and so does not qualify as an indirect selling expense under 19 U.S.C. § 1677a(d)(1) and 19 C.F.R. § 351.402(b). Commerce's determination that accrued interest from unpaid antidumping duties is not an indirect selling expense is supported by substantial evidence and in accordance with law. Therefore, the court denies Domtar's motion and sustains Commerce's Final Results. Judgment will enter accordingly.

**SO ORDERED.**

*/s/  Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: October 10, 2025
          New York, New York